**CITY OF COPPELL et al., Appellants,**

v.

**STATE of Texas on relation of John BURNS and J. R. McDonald, Appellees.**

No. 17126.

Court of Civil Appeals of Texas.

Dallas.

Nov. 22, 1968.

Rehearing Denied Jan. 3, 1969.

Lawrence W. Jackson, of Saner, Jack, Sallinger & Nichols, Dallas, for appellants.

Sandy M. Sandoloski, of Weinberg & Sandoloski, Douglas E. Bergman and John W. Clark, Jr., Dallas, for appellees.

DIXON, Chief Justice.

This is a quo warranto proceeding. It challenges the validity of two disannexation ordinances passed by the Town of Coppell, now known as City of Coppell.

It is the second time the dispute has been before us. The first action was not in the form of quo warranto. We reversed the trial court's judgment on the ground, among others, that the validity of the disannexation ordinances could be questioned only in a quo warranto proceeding. Lusby v. Cozby, 402 S.W.2d 799 (Tex.Civ.App., Dallas 1966, no writ). In conformity with such holding this action was thereafter filed by the State of Texas on the relation of John Burns, J. R. McDonald and others similarly situated.

On March 1, 1965 the Council of the Town of Coppell passed Ordinance No. 20 disannexing a certain area in the City lying north of Sandy Lake Road. On February 1, 1966 the Council passed Ordinance No. 28 disannexing an area still farther north of Sandy Lake Road, but contiguous to the first area.

In each of the ordinances the City made express finding that area being disannexed contained 10 or more acres, that each of the areas was uninhabited, that in each area there were not three or more occupied residences or business structures on any one acre. These findings were made in an effort to comply with Art. 973, Vernon's Ann.Civ.St.

Petitioners contend that the above findings are false and untrue; and were made as part of a conspiracy on the part of the mayor and councilmen to deprive the inhabitants of the two areas of their rights as citizens of the City—in particular their right to vote in pending elections in which it was well known that they would vote in opposition to the Council's policies. It was

also charged that Ordinance No. 20 was passed to eliminate, and did eliminate, Councilman J. R. McDonald as a member of the Council. McDonald, a resident of the disannexed area, was a leader in opposing the administration in various matters, particularly in a bond election soon to be held.

In answer to four special issues a jury found that (1) there were three or more occupied residences or business structures on any one acre as of March 1, 1965 within the area defined by Ordinance No. 20; (2) the same finding was made as of February 1, 1966 with reference to the area defined in Ordinance No. 28; (3) a majority of the City Council conspired to pass Ordinance No. 20 for the purpose of preventing the residents of the area from voting in the bond election of March 27, 1965; and (4) a majority of the Council conspired to pass Ordinance No. 28 for the purpose of preventing the residents of the area from voting in the City election of April, 1966.

The trial court overruled the City's motions for judgment *non obstante veredicto* and to disregard certain answers of the jury. *The motion of petitioners for judgment on the verdict was sustained.* The two ordinances were declared to be invalid and null and void. The areas purportedly disannexed by the ordinances were declared still to be a part of the City of Coppell and their citizens and residents to be still entitled to their rights and privileges as if Ordinances Nos. 20 and 28 had not been passed.

The nature of appellants' points of error requires us to go into some detail in our account of the evidence.

## EVIDENCE

Much of the evidence is undisputed. Ordinance No. 20 was passed on March 1, 1965, only 26 days before a bond election to be held March 27, 1965. The election was to determine whether the City would issue bonds of $440,000 to install a water and sewer system. The system if installed would not serve the two disannexed areas north of Sandy Lake Road. The Council's position was that it would be too expensive to include the areas. It was common knowledge that the 50 voters in the area described in Ordinance No. 20 would vote solidly against the issuance of the bonds. They were not permitted to vote in the election. Even then one of the four issues carried by only nine votes; none of the others by more than 20 votes.

From time to time petitions had been presented to the Council seeking disannexation of the areas. However at the time Ordinance No. 20 was passed all petitions had been withdrawn. There is testimony that at that time the residents of the two areas did not desire to be disannexed.

At the meeting held March 1, 1965 when Ordinance No. 20 was passed two proposed ordinances had been prepared and were before the Council for consideration. One proposed ordinance would disannex the property and residence of Councilman McDonald and his father. The other would allow his property to remain in the City. McDonald was asked whether he wanted to remain in the City. He replied that he did. Nevertheless the ordinance was passed which disannexed his property. McDonald had made it plain that he would vote against the issuance of the bonds. The disannexation of his property had the effect of eliminating him as a member of the Council.

Ernest Perkins fared better with the Council. He also requested that his property not be disannexed. He stated that he favored the issuance of the bonds. His property was not included in the area which was disannexed.

Ordinance No. 28 was passed a short time before the City election of 1966, in which election a mayor and two councilmen were to be chosen. There was testimony that the voters in this area, about 25 in number, were opposed to the City administration and its policies.

The area disannexed by Ordinance No. 28 lies north of the area earlier disannexed

by Ordinance No. 20. One reason given for the second disannexation was that the area first disannexed lay between the City and the second area, thus making it necessary to go through the area earlier disannexed in order to serve the second area. However there was testimony that the second area could be served by running facilities along Sandy Creek Road. Though the City of Coppell had disannexed the two areas the City Council a short time later refused to waive its extra-territorial jurisdiction when the inhabitants of the two areas attempted to organize their own municipality under the name of the City of Jamestown. The nearby Cities of Dallas and Carrollton had waived their extra-territorial rights. Art. 970a, Sections 3, subd. A and 8, subd. A, V.A.C.S.

It is undisputed that before making its findings the Council did not cause a formal survey of the two areas to be made. The only investigations made by the City were made by members of the Council who either observed the areas from automobiles or afoot.

There is testimony from two licensed surveyors that there were several acres within the area on each of which there were three or more occupied residences or business structures. These surveys were not made on March 1, 1965 or February 1, 1966, so the licensed surveyors were not able to testify as to occupancy of the structures on said dates. However several of the residents of the areas did testify that on said dates residences and business structures, at least three in number, were occupied on each of several acres.

The mayor and two members of the Council testified that they voted for disannexation because the residents of the two areas apparently wanted to be disannexed; and since the sewer and water system and other city services would not be available to them the City thought to accommodate them by disannexing them, thus relieving them of all taxes.

However, the testimony of the mayor and some of the councilmen gives other reasons for their vote in favor of disannexation. The administration of the City's affairs has been marked by dissension. The chief dissenters have been the inhabitants of the two disannexed areas. The extent and bitterness engendered by their opposition is evidenced by the testimony of the mayor and councilmen.

Since the jury found that the members of the Council conspired to pass Ordinances Nos. 20 and 28 in order to deprive the residents of the two areas of their right to vote we deem it advisable to quote some of the testimony.

The mayor testified as follows:

"Q And you voted Mr. McDonald's area out of the City, didn't you?

A Yes.

Q And you mean he wasn't offered a choice before that vote was taken as to whether he was to stay in or get out?

A Yes, he was asked if he wanted to stay in.

Q All right.

A Or to be disannexed with his area. The area that he lived in.

Q That's right, but what choice did he have to make if he wanted to stay in?

A Well, he was asked if he wanted to stay in or be disannexed and he said he wanted to stay in, in the City of Coppell.

Q But he wasn't going to vote for the bond issue?

A That's right."

*   *   *   *   *   *

"Q Now, let me ask you this: If that is the case, why did the five acre tracts stay in Coppell when there was only one house on it?

A Well, he didn't want to be disannexed."

\* \* \* \* \* \*

"Q Mayor Cozby, one last question. You said that you all felt that you were dealing in good faith with these people and let me ask you this: After 20 was disannexed under 20 and the area under 28, these people petitioned the City of Coppell asking the City of Coppell to waive their extra-territorial jurisdiction as had the City of Carrollton and Dallas done in order that they could form a town called Jamestown, do you remember that?

A Yes, sir.

Q And the City of Coppell refused to grant or waive their extra-territorial jurisdiction, did they not?

A Yes."

\* \* \* \* \* \*

"Q Now, let me ask you one more question, Mr. Mayor, why did you disannex or what was the basis or reason for disannexing the area north of Sandy Lake Road in Ordinance 20 before you disannexed the farther out property that was disannexed by Ordinance 28?

A Well, the people in Ordinance 20 were more dissatisfied than the people in Ordinance 28.

Q Well, why didn't you take them both out at the same time?

A Well, later on we got more opposition from Ordinance 28 and then we decided to disannex them.

Q I will ask you, Mr. Mayor as a fringe benefit to say the least of your action in adopting Ordinance 20 you eliminated Mr. McDonald from the City Council, didn't you?

A Yes.

Q And that eliminated somewhat the leader of your opposition, did it not?

A Somewhat."

\* \* \* \* \* \*

"Q And that was the reason that you passed this disannexation statute to get him off of the Council, wasn't it?

A Well, we—that might have been one reason."

\* \* \* \* \* \*

A member of the Council testified as follows:

"Q Was there an election held to determine this levy of a twenty-five cent tax or was it an ordinance adopted by Council?

A That was an ordinance adopted by the Council."

\* \* \* \* \* \*

"Q Now, then, you have testified there was some objections by primarily the people up here in north of Sandy Lake Road to the adoption of that tax, is that what you have testified to?

A That's right."

\* \* \* \* \* \*

"Q Did you have a budget?

A We did not.

Q You did not. Did you have any provisions or any outline of how the money was to be spent that came from this tax and on who and where and what improvements?

A In our minds we had an outline, yes.

Q Well, you didn't communicate that thinking in your minds to any people out there, I will put it that way.

A At that time, we did not.

Q This was all down in the deep dark recesses of the minds of the Council and no budget had been adopted?

A None had been filed."

\* \* \* \* \* \*

"Q Now, at the time of the adoption of Ordinance 20 those people had withdrawn that petition, hadn't they?

A Repeat it.

Q At the time of the adoption on March the 1st of Ordinance 20, those people had withdrawn that petition, hadn't they?

A Yes, sir, they had.

Q You had no petition from anybody to disannex any area on March the 1st, 1965, did you?

A We did not."

*   *   *   *   *   *

"Q And you offered or proposed the passage of the ordinance that would delete him from the City, didn't you?

A The Council proposed it, yes."

*   *   *   *   *   *

"Q Now, not only did that take him out of the area of the City, that took him off of the City Council, didn't it?

A Yes, sir.

Q And yet, you left the people over here in the corner who were with you, on each corner there, you left them in?

A Yes, sir."

*   *   *   *   *   *

"Q * * * What other investigation did you make?

A * * * we had had rumors prior to this time of what the people in this area were getting for their twenty-five cent tax rate, and we saw that they were very displeased with this twenty-five cent tax rate and getting, as they said, nothing in return, which we, of course, disagreed with them at that time because they were getting exactly what the rest of the people were getting, voluntary fire protection and a police—the best police protection we could give them, and exactly what the rest of the people in Coppell were getting for their twenty-five cent tax rate."

*   *   *   *   *   *

"A * * * We could see that we could not work with these people and, in view of their dissatisfied attitudes, why, we said, 'Well, the thing to do is let them out like they want.'"

*   *   *   *   *   *

"Q Now, then, you have testified, Mr. Wilson, at the time you voted on Ordinance 20 that it was your view that anybody that wanted to stay in the City was welcome to stay in, isn't that what you testified to?

A I believe I did, yes.

Q All right, and at the very time that was in your mind, Mr. McDonald stated to you, a fellow councilmember, that he wanted to stay in the City, didn't he?

A He did.

Q And you promptly voted him out, is that right?

A Yes.

Q What was your reason for voting him out when he wanted to stay in?

A Mr. McDonald had stopped the Council from doing anything we were trying to do. In other words, he hadn't stopped us, but he was opposed to everything we tried to do and—

Q He was 'agin' you, wasn't he?

A He was against us, at that time.

Q And the easiest way to eliminate that 'agin-ness' was to just eliminate him from the City, wasn't it? That eliminated him pretty good, didn't it?

A That eliminated him, yes, sir."

*   *   *   *   *   *

"Q You do know, don't you, that when they applied to the City of Coppell City Council that they refused to waive their extra jurisdiction?

A They did.

Q What was the reason for that? If you didn't want these people, why didn't you want them to form their own city?

A We don't want them to form their own city."

*   *   *   *   *   *

"Q Did you ever hear Mayor Cozby make the statement to the council that if

you plant two trees together, one of the trees will sap the roots of the other?

A    Yes, sir.

Q    And you were afraid the City of Jamestown would sap the roots of the City of Coppell, weren't you?

A    It's very possible.

Q    And so, you refused to let them organize their own city?

A    We refused to release our territory rights over them.

Q    Well, that, in effect, blocked them from forming their own city, didn't it, you know that, they had to have your release before they could do it under the statutes of the State?

A    They did."

A former member of the Council who was a member when the two ordinances were passed testified as follows:

"Q    All right, Mr. Harwell, I believe you testified also that you knew the pulse of the community up here in the area north of Sandy Lake Road and also the area down there disannexed by Ordinance 28, was that your testimony that you knew the pulse?

A    I believe I said that."

\*    \*    \*    \*    \*    \*

"Q    Well, then, what do you mean by the pulse of the community?

A    What I meant by the pulse of the community?

Q    Yeah.

A    Well, of course, we had had nothing but agitation and harassment from, particularly, this group north of Sandy Lake Road.  Numerous lawsuits and trying to abolish the community which is something like a hundred years old and it seemed like that was the core of the dissentment.

We felt like maybe that would sort of piece things together, let those people out

and they wouldn't be burdened by this 25 cent tax."

\*    \*    \*    \*    \*    \*

"Q    Now, then, at the time that you had these altruistic views and sympathy with these people out there, you also voted as a member of the Council to refuse to permit them to organize their own city, didn't you?

A    I don't recall the record.  I don't recall whether we had a vote on that or not.

Q    Well, you know that the City Council of Coppell refused to waive their extra-territorial jurisdiction where these people could organize the City of Jamestown, you know that, don't you?

A    Yes, sir."

\*    \*    \*    \*    \*    \*

"Q    Were you on the City Council when they refused to waive their extra-territorial jurisdiction?

A    I believe I was, yes, sir."

## OPINION

In their first four points of error appellants City and its mayor and councilmen say that they made a finding that on March 1, 1965 and February 1, 1966 respectively there were not three or more occupied residences or business structures on any one acre within the areas defined by Ordinances Nos. 20 and 28; that these were quasi-judicial acts; that there were no findings of fraud on the part of the City in making such quasi-judicial determinations; therefore the court was not authorized to go behind these quasi-judicial findings.

In other points appellants say there was no evidence, or at least there was insufficient evidence, to support the jury's other findings; and that the court erred in failing to sustain appellants' motions to render judgment *non obstante veredicto* and to disregard the jury's answers to certain issues.

We have concluded that appellants' points of error should be overruled and the judgment of the trial court should be affirmed.

■ There is ample evidence to support the jury's finding that when the two ordinances were passed there were three or more occupied residences or business structures on any one acre within the areas defined.

■ Appellants claim that each of such acres must be in the form of a square. We do not agree. The statute does not define or describe the word acre. No definition was requested or given in the charge of the court. Appellants made no objection to the charge.

There is some testimony to support the jury's answers even if only square acres are considered. There is an abundance of testimony if acres not in the form of a perfect square are considered.

Respected authorities define an acre as being "A quantity of land containing 160 square rods of land, in whatever shape." Black's Law Dictionary (4th Edition); 1 C.J.S. 921; Art. 5730, V.A.C.S., says, " * * * The acre for land measure shall be measured horizontally and shall contain forty eight hundred and forty square yards * * *."

■ Appellants contend that the findings of the City Council are quasi-judicial in nature and courts cannot go behind them *unless* there be a finding by the court or jury of fraud in connection with the council's determination. State ex rel. Rea v. Etheridge, 32 S.W.2d 828 (Tex.Comm'n App.1930); City of Farmersville v. Texas-Louisiana Power Co., 33 S.W.2d 272 (Tex. Civ.App., Dallas 1930, reversed on other grounds 67 S.W.2d 235); School Board of City of Marshall et al. v. State of Texas Criminal District Attorney ex rel. Warbritton et al., 162 Tex 9, 343 S.W.2d 247 (1961).

We do not see how the holdings in the above cases help appellants' cause. For the record before us shows that there was a finding equivalent to fraud. The jury found in answering Special Issues Nos. 3 and 4 that a majority of the Council entered into a conspiracy for the purpose of depriving the residents of the two areas from voting in the bond election of 1965 and the regular City election of 1966. No objections were made either to the form or substance of Special Issues Nos. 3 and 4.

■ A civil conspiracy may be proved by either direct or circumstantial evidence. Because of the nature of the wrong, circumstantial evidence usually must be relied on to make out a case. Great latitude is allowed in proving a conspiracy. 12 Tex.Jur.2d 341. We think there was sufficient evidence to support the findings of the jury.

■ "Conspiracy" has been defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. 12 Tex.Jur.2d 336. Conspiracy has also been defined in terms of fraud. Black's Law Dictionary (4th Edition), p. 383; Plumer v. Houghton & Dutton Co., 277 Mass. 209, 178 N.E. 716 (1931); Borgos v. Price, 140 Misc. 287, 250 N.Y.S. 457; Alexander v. United States, 95 F.2d 873, 880 (8th Cir. 1938).

Appellants' points of error are overruled.

The judgment of the trial court is affirmed.